Jerry E. WATKINS, Petitioner,

v.

Charles MILLER, Respondent.

No. IP97–0485–C–H/G.

United States District Court,
S.D. Indiana,
Indianapolis Division.

April 24, 2000.

Joseph M. Cleary, Hammerle Foster & Long–Sharp, Indianapolis, IN, William E. Marsh, Indiana Federal Community Defenders, Indianapolis, IN, for Plaintiff.

Michael A. Hurst, Deputy Attorney General, Indianapolis, IN, Thomas D. Perkins, Office of the Indiana Attorney General, Indianapolis, IN, for Defendant.

## ENTRY ON PETITION FOR WRIT OF HABEAS CORPUS

HAMILTON, District Judge.

The United States Constitution requires a fair trial but not a perfect one. Petitioner Jerry E. Watkins received neither, for the prosecutor in his murder case failed to disclose to Watkins' lawyers important information tending to show he was not guilty. The Constitution requires the government in a criminal prosecution to disclose exculpatory information to the defense. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

The rule of *Brady v. Maryland* is founded upon the most basic constitutional guarantee to a person accused of a crime: the right to due process of law and a fair trial. The government is not entitled to convict a person and send him to prison while it conceals from him material evidence that tends to show he is not guilty. This habeas corpus case illustrates both the importance of this principle and the fallibility of the criminal justice system.

A jury convicted petitioner Jerry E. Watkins of a brutal murder, and the Indiana state courts have upheld Watkins' conviction. However, Watkins has presented to the state courts and to this court new evidence from DNA tests that show he is probably innocent of the murder. In the course of this federal proceeding, Watkins has also discovered and has demonstrated that the prosecution systematically violated his constitutional right to a fair trial by failing to disclose to his lawyers important evidence that tends to show he is not guilty. These circumstances dictate that Watkins is entitled to a federal writ of habeas corpus setting aside his state conviction.

*Summary*

In November 1984, eleven-year-old Margaret ("Peggy") Sue Altes was abducted, raped, and brutally murdered. Her body was left in brush at the edge of a field and was discovered five days after she had disappeared. The shocking crime received extensive publicity. The Hancock County Sheriff's Department investigated a number of suspects and leads for months without success.

Petitioner Watkins was, understandably, a suspect from the early stages of the case. Peggy Sue was the younger sister of Watkins' wife Janice. In September 1984, Watkins had sexually molested Peggy Sue. On Saturday, November 10, 1984, two days before Peggy Sue disappeared, Watkins' wife had caught Watkins molesting Peggy Sue again. Other family members quickly learned of the incident, although Watkins and his wife reconciled that same weekend. In 1985, after Peggy Sue's death, Watkins was charged with and pled guilty to having molested her in September 1984. He served his prison sentence for that crime.

Then, in March 1986, more than a year after Peggy Sue's death, Watkins was charged with her murder. The prosecution sought the death penalty. In a trial during August and September 1986, a jury found Watkins guilty of murder. At the penalty phase of the trial, the jury recommended against the death penalty. The Hancock Superior Court accepted the jury's recommendation and sentenced Watkins to 60 years in prison. The Supreme Court of Indiana affirmed Watkins' conviction and sentence on direct appeal. *Watkins v. State*, 528 N.E.2d 456 (Ind. 1988).

In 1992, Watkins sought post-conviction relief in the state courts based on new evidence from DNA testing, which had not been available at the time of his trial. As explained in more detail below, the DNA testing showed the victim's body contained semen which—to a certainty—could not have come from Watkins. The trial court nevertheless denied relief, concluding the DNA evidence was only cumulative of evidence at trial of inconclusive blood tests that suggested the possibility of a blood type not consistent with either Watkins or the victim.

The Indiana Court of Appeals affirmed the denial of post-conviction relief in an unpublished opinion. See *Watkins v. State*, No. 30A04–9504–PC–118, 1996 WL 42093 (Ind.App. Jan.29, 1996). That opinion reflects a clear misunderstanding of the DNA evidence. The Court of Appeals said the DNA results only "suggest the possibility" of another perpetrator. In fact those results prove beyond a reasonable doubt that someone other than Jerry Watkins raped the victim when she was murdered. Based on that misunderstanding of the evidence, the Court of Appeals also concluded that the DNA evidence was merely "cumulative" of the inconclusive trial evidence about the results of blood type tests. The Supreme Court of Indiana denied Watkins' petition for transfer.

In March 1997, acting *pro se*, Watkins filed in this court a petition for a writ of habeas corpus contending that his conviction was obtained in violation of his federal constitutional rights. This court initially denied Watkins' request for appointment of counsel on his behalf. After full briefing of the petition by Watkins, however, in November 1998 this court appointed counsel for Watkins to file a supplemental brief on his behalf. Counsel prepared and filed a supplemental brief. After a conference with counsel for both Watkins and respondent in July 1999, and with the agreement and cooperation of counsel for respondent, the court gave Watkins' counsel a further opportunity to investigate the facts of the case and to file an amended petition. The amended petition was filed on November 5, 1999, along with an Appendix containing new documentary evidence. Watkins' custodian has responded to the claims, and Watkins filed his traverse on March 29, 2000.

On April 10, 2000, the court conferred with counsel for both parties on their interest in an evidentiary hearing. Counsel for both sides stated that they did not seek an evidentiary hearing and that the court should decide the matter on the written submissions. The expansion of the record that has occurred in this case is the functional equivalent of an evidentiary hearing. That approach was appropriate under 28 U.S.C. § 2254(e)(2) because, as explained below, there is no indication here that Watkins or his lawyers were at fault for failing to discover the prosecutor's *Brady* violations before the state proceedings concluded. See *Michael Williams v. Taylor*, —— U.S. ——, 120 S.Ct. 1479, 1487, 1491–92, 146 L.Ed.2d 435 (2000) (§ 2254(e)(2) bars evidentiary hearing in federal habeas action only if failure to present factual basis of claim to state court was the result of some fault on petitioner's part).[1] Moreover, even if § 2254(e)(2) ap-

---

1. On April 18, 2000, the Supreme Court of the United States issued two important decisions interpreting the 1996 amendments to 28 U.S.C. § 2254. Both cases are cited in this

decision, and both would ordinarily be cited as *"Williams v. Taylor."* The court is therefore using both petitioners' first names to help distinguish the two cases.

plied, Watkins also satisfies the stringent requirements of the escape clause in that provision. Watkins' *Brady* claims that entitle him to relief are based on a factual predicate that could not have been previously discovered through the exercise of due diligence, and the facts underlying the claims establish by clear and convincing evidence that, but for the *Brady* violations, no reasonable fact finder would have found Watkins guilty of the underlying offense. See 28 U.S.C. § 2254(e)(2) (exception permitting evidentiary hearings even if petitioner was at fault for failing to develop factual predicate in state court).

As explained in detail below, the court grants Watkins' petition for a writ of habeas corpus because his conviction and continued imprisonment violate the United States Constitution. Watkins has come forward with compelling evidence that he is actually innocent of murdering Peggy Sue Altes. The state has always contended that Peggy Sue was raped at the time she was killed. The DNA evidence shows conclusively that Watkins could not have been the source of at least some of the semen found in the victim's body. The most reasonable explanation of that scientific evidence is that one man—who could not have been Watkins—raped the victim.

The DNA evidence does not exclude the theoretical possibility that the semen might have come from two men, one of whom might have been Watkins. However, the undisputed expert testimony shows that such a possibility is "farfetched" from a scientific standpoint. The theory depends on the improbable assumption that semen from two different men just happened to be collected on the same vaginal swab in exactly equal amounts. The theory is also utterly inconsistent with the theory of the case the prosecution presented to the jury. In addition, the state courts' treatment of the DNA evidence as merely cumulative of the blood type test results introduced at trial was plainly unreasonable because it was based on a clear misunderstanding of that evidence.

Whether even powerful evidence of actual innocence as a free-standing claim is enough to justify federal habeas relief from a state conviction is a matter of considerable debate in the courts. See, *e.g., Herrera v. Collins,* 506 U.S. 390, 417, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) (noting that "the traditional remedy for claims of innocence based on new evidence, discovered too late in the day to file a new trial motion, has been executive clemency," then assuming but declining to hold that "a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional").

In this case, however, petitioner Watkins is not making a free-standing claim of innocence. He has also shown that the prosecution systematically violated his constitutional right to a fair trial and due process of law by failing to disclose to his lawyers a variety of exculpatory evidence. That suppressed evidence includes evidence: (a) that an undisclosed witness saw Peggy Sue being abducted at a time for which Watkins has a solid alibi, and by a person who could not have been Watkins; (b) that another suspect in the case failed a polygraph test; and (c) that investigators received reports of other men who had known Peggy Sue and who either told others they had killed her or turned up with blood on their clothes the night she disappeared.

In addition to showing the prosecution's systematic failure to disclose this exculpatory information, Watkins has come forward with new evidence from the state's chief witness, Dennis Ackeret, to the effect that the state's case was built upon knowingly perjured testimony. Ackeret testified at trial that Watkins had confessed the crime to him while they were briefly together in a holding cell in the Marion County courts. In the newly discovered evidence, Ackeret swore in a court filing in his own case in 1987 that he learned the details of the crime not from Watkins, as Ackeret testified and as the state argued

at trial, but from the prosecutors and/or investigators.

Because the case against Watkins was so thin at trial, and because it has been so thoroughly undermined by the new DNA evidence, the prosecutor's failures to disclose at least the witness to the abduction and the fact that another suspect failed a polygraph test are each sufficient to require the court to grant relief. There is " 'a reasonable probability' that the result of the trial would have been different" if either of those suppressed items had been disclosed to the defense, as the Constitution required. *Strickler v. Greene*, 527 U.S. 263, 288, 119 S.Ct. 1936, 1952, 144 L.Ed.2d 286 (1999) (adopting standard for prejudice element of *Brady* claim). The court therefore is today issuing a writ of habeas corpus ordering the State of Indiana within thirty (30) days to release Jerry Watkins from custody based on his conviction for murdering Peggy Sue Altes, although the Constitution and the writ do not prohibit Indiana from attempting to retry Watkins. The court has not attempted to resolve on the paper record the truth or falsity of Ackeret's accusation that prosecutors and/or investigators fed him the factual details of the murder to help him testify convincingly, but falsely, about Watkins' supposed confession.

### Discussion

I. *Watkins' Amended Claims and the Procedural Requirements for Habeas Relief*

■ Watkins seeks relief pursuant to 28 U.S.C. § 2254(a). Under that statute, the court may award him relief only if he demonstrates he is in custody pursuant to the judgment of a state court in violation of the Constitution, laws, or treaties of the United States. *E.g., Del Vecchio v. Illinois Dep't of Corrections*, 31 F.3d 1363, 1370 (7th Cir.1994) (*en banc*).

■ Because Watkins filed his federal habeas petition after enactment of the Antiterrorism Effective Death Penalty Act (AEDPA) on April 24, 1996, that Act's restrictions on federal review of state court rulings apply to this case. See *Michael Williams v. Taylor*, —— U.S. ——, 120 S.Ct. 1479, 1486, 146 L.Ed.2d 435 (2000); *Lindh v. Murphy*, 521 U.S. 320, 326, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Under the AEDPA, a federal court must deny a habeas petition on a claim adjudicated on the merits in state court unless the state court adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)

■ When considering habeas petitions under the AEDPA, federal courts must keep in mind the difference between an "unreasonable application of federal law" and an "incorrect application of federal law." *Terry Williams v. Taylor*, —— U.S. ——, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The Supreme Court's recent interpretation of that difference in the *Terry Williams* case is consistent with the Seventh Circuit's many opinions applying 28 U.S.C. § 2254(d) as amended by the AEDPA. See, *e.g., Schaff v. Snyder*, 190 F.3d 513, 523 (7th Cir.1999). In *Hall v. Washington*, the Seventh Circuit explained:

The statutory "unreasonableness" standard allows the state court's conclusion to stand if it is one of several equally plausible outcomes. On the other hand, Congress would not have used the word "unreasonable" if it really meant that federal courts were to defer in all cases to the state court's decision. Some decisions will be at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary, that a writ must issue.

106 F.3d 742, 748–49 (7th Cir.1997); see also *Rivera v. Sheriff of Cook County*, 162 F.3d 486, 489 (7th Cir.1998) (federal courts

denied relief after state courts determined that trial judge who granted new trial after bench trial did not acquit defendant; state courts' determination was not "an unreasonable determination of the facts in light of the evidence presented," but was "a plausible descrambling of an ambiguous oral remark").

Watkins has stated his amended claims for federal habeas relief in four sets. First, he claims the prosecutor violated his rights under *Brady* and the Fifth, Sixth, and Fourteenth Amendments by failing to disclose to the defense exculpatory information in the prosecution's exclusive possession. The suppressed evidence included an eyewitness who saw Peggy Sue's abduction at a time and place for which Watkins had an alibi, and with a description of a culprit who did not look at all like Watkins; information from several witnesses regarding other suspects; information that another suspect in the case had failed a polygraph test; and evidence tending to impeach the credibility of the state's key witness, Dennis Ackeret. Watkins has also discovered a sworn statement from Ackeret in 1987 repudiating his trial testimony and swearing that he learned the critical details of the crime not from Watkins but from investigators and/or prosecutors who showed him photographs of the victim and even took him to the murder site. If that statement is true, as Watkins contends, the prosecution also suppressed that explosive information.

In his amended claims, Watkins also asserts that the state violated his rights under the Fifth, Sixth, and Fourteenth Amendments by failing to correct numerous false and misleading impressions given to the jury as a result of the failures to disclose the foregoing items. Watkins asserts in the alternative a claim that his lawyers were ineffective before and during trial because they failed to discover the information the state suppressed. Finally, Watkins asserts under the Fourteenth Amendment that the evidence against him is insufficient to support a conviction.[2]

Watkins did not raise any of his *Brady* claims or his other amended claims in the state courts.[3] Before considering the merits of a petition for habeas corpus, a federal court must ensure that the petitioner has satisfied two procedural requirements: exhausting state remedies and avoiding procedural default. Failure to exhaust all state remedies ordinarily bars consideration of the petition, and failure to raise a claim during the course of the state court proceedings ordinarily amounts to procedural default that bars consideration of a claim not raised. See *Jones v. Washington,* 15 F.3d 671, 674 (7th Cir.1994), *overruled on other grounds, Hogan v. McBride,* 74 F.3d 144, 147 (7th Cir.1996); see also *Cawley v. DeTella,* 71 F.3d 691, 694 (7th Cir.1995) ("if the state in which the habeas petitioner was convicted would treat failure to appeal as a procedural default barring further review, that

2. Watkins' original petition sought relief on numerous grounds. The court understands Watkins' amended petition to supersede the claims in his original petition.

3. In his direct appeal in the state courts, Watkins argued that the trial court erred: (1) by admitting inflammatory evidence; (2) by revoking its order *in limine,* thereby allowing evidence of uncharged sexual misconduct by Watkins with an older sister of the victim; (3) by not modifying another order *in limine* to allow Watkins to present evidence that he had passed a lie detector test after the jury heard testimony that the police had cleared another suspect because he had taken and passed a lie detector test; (4) by failing to take effective remedial measures after a prosecution witness launched an evidentiary harpoon on cross-examination by testifying about the other suspect's lie detector test; (5) by admitting numerous newspaper articles regarding the charged crime; and (6) by denying his request for a post-trial hearing on newly discovered evidence that Ackeret had testified falsely about the alleged jailhouse confession. In the post-conviction proceeding in state court, Watkins presented the single claim that the trial court had erred in denying his petition for post-conviction relief on the ground that new evidence of DNA testing had been submitted and that the new evidence would have produced a different result at the trial.

default likewise bars federal review of the claim"); 28 U.S.C. § 2254(b) (statutory requirement of exhaustion of state remedies). Watkins has satisfied both of these requirements. He has shown that no state remedies are available to him, so that he has exhausted those remedies. In addition, he satisfies the "cause and prejudice" exception and the "fundamental miscarriage of justice" exception to the doctrine of procedural default.

Although the requirement of exhausting available state remedies and the doctrine of procedural default are closely related and are often addressed together, there is an important difference between them. To determine whether a claim has been exhausted, the question is whether any meaningful state remedies are still available at the time of the federal petition. *Engle v. Isaac,* 456 U.S. 107, 125–26 n. 28, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982); accord, *Castille v. Peoples,* 489 U.S. 346, 351, 109 S.Ct. 1056, 103 L.Ed.2d 380 (1989) ("the requisite exhaustion may nonetheless exist, of course, if it is clear that respondent's claims are now procedurally barred under Pennsylvania law"); *Teague v. Lane,* 489 U.S. 288, 297–298, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

■ Thus, even though a claim was never presented to the state courts (at least as a constitutional claim), state remedies for the claim can be exhausted for purposes of § 2254(b) if it is clear that the doors of the state courts are no longer open to consider the claim. In such cases, even if a claim was procedurally defaulted in the state courts, the exhaustion requirement is satisfied because there are no longer remedies available for the petitioner to exhaust. See *Gray v. Netherland,* 518 U.S. 152, 161, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996) (because exhaustion requirement refers only to remedies still available at the time

of the federal petition, it is satisfied if it is clear the petitioner's claims are now procedurally barred under state law); *Coleman v. Thompson,* 501 U.S. 722, 732, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Engle v. Isaac,* 456 U.S. at 125–26 n. 28, 102 S.Ct. 1558.

■ Petitioner Watkins pursued his direct appeal to the Supreme Court of Indiana, and he pursued post-conviction relief to the same court. Also, the state courts directly considered and rejected Watkins' claim that the new DNA evidence shows his innocence. Under these circumstances, there is no reason to expect that Watkins could use that evidence now to invoke Indiana's doctrine of "fundamental error" to seek some type of extraordinary relief, such as filing a successive petition for post-conviction relief. See generally, *e.g., Arthur v. State,* 663 N.E.2d 529, 531–32 (Ind.1996); *Bailey v. State,* 472 N.E.2d 1260, 1263 (Ind.1985). The state does not contend that any further procedures are available to Watkins to present any of the claims he raises in his amended claims. Thus, all state remedies are exhausted for purposes of this case.[4]

The state vigorously contends, however, that Watkins has procedurally defaulted on the claims presented in his amended petition, except for the new *Brady* claims, which are based on evidence his attorney discovered in the course of this federal case. See *Crivens v. Roth,* 172 F.3d 991, 995–96 (7th Cir.1999) (petitioner had not defaulted his *Brady* claims based on newly discovered information: "We will not penalize Crivens for presenting an issue to us that he was unable to present to the state courts because of the state's misconduct."). Watkins did not present his amended claims to the state courts, or at least did not present them as federal constitutional

---

4. The distinction between exhaustion and procedural default can be important in the procedural complexities of habeas corpus law because of the rule established in *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), requiring dismissal of "mixed" petitions presenting both exhausted and unex-

hausted claims. See *Bailey v. Nagle,* 172 F.3d 1299, 1306–07 (11th Cir.1999) (Carnes, J., concurring) (distinguishing exhaustion and procedural default and criticizing opinion that confused the two doctrines because of mixed petition problem).

claims. As a result, this court may not review the merits of the claims on which Watkins has procedurally defaulted unless Watkins either (1) shows cause for the default and actual prejudice as a result of the alleged violation of federal law, or (2) demonstrates that failure to consider his claims will result in a fundamental miscarriage of justice. *E.g., Coleman v. Thompson,* 501 U.S. at 749–50, 111 S.Ct. 2546. The "miscarriage of justice" doctrine "differs qualitatively from other legal arguments in that, by its very nature, it serves as the last line of defense against a fundamentally unjust incarceration." *Mills v. Jordan,* 979 F.2d 1273, 1277–78 (7th Cir. 1992), *superseded by statute on grounds not relevant here,* as stated in *Hope v. United States,* 108 F.3d 119, 120 (7th Cir. 1997). Watkins relies on both grounds for overcoming the obstacle of procedural default.

First, with respect to the *Brady* claims, a brief discussion of the basis for the state's concession is in order. A *Brady* claim has three components: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 280, 119 S.Ct. 1936, 1948, 144 L.Ed.2d 286 (1999). *Strickler v. Greene* shows that a *Brady* claim may be raised for the first time in a federal collateral proceeding where support for the claim was not discovered before the state court proceedings concluded. 527 U.S. at 280–82, 119 S.Ct. at 1948–49. The Supreme Court's recent decision in *Michael Williams v. Taylor,* —— U.S. ——, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000), which applied the AEDPA amendments to 28 U.S.C. § 2254(e), is also consistent with *Strickler* and the state's concession in this case. In *Michael Williams,* the Court unanimously held that the AEDPA does not bar a petitioner from presenting new evidence to a federal court where the prosecution has concealed the relevant facts through the course of state court proceedings. —— U.S. ——, 120 S.Ct. 1479, 1490, 1492–93, 146 L.Ed.2d 435. As explained below in Part IV, Watkins exercised due diligence in the state courts to obtain disclosure of the *Brady* material. The prosecutor failed to produce it despite timely, repeated, and clear requests.

In *Strickler* the Supreme Court addressed the interplay between the "cause and prejudice" exception to the procedural requirements and the elements of a *Brady* claim itself, which parallel cause (the defendant was not aware of the exculpatory material) and prejudice (the material is important enough to undermine confidence in the outcome of the trial). See 527 U.S. at 282, 119 S.Ct. at 1949. The Court held that the petitioner established cause for failing to raise his *Brady* claim in the state courts because he was not aware of the factual basis for the claim until after proceedings in the state courts had concluded. 527 U.S. at 285–86, 119 S.Ct. at 1951–52; cf. *Michael Williams v. Taylor,* —— U.S. ——, 120 S.Ct. 1479, 1491–92, 146 L.Ed.2d 435 (2000) (under AEDPA petitioner not entitled to hearing on *Brady* claim where his lawyer was aware of factual basis for such claim during state court proceedings but failed to develop the claim in state courts).

In light of *Strickler,* the state does not contend in this case that Watkins defaulted his *Brady* claims for suppression of exculpatory evidence. See Resp. Mem. at 15–16, citing *Strickler.* The state also does not deny that it suppressed the material in question, nor does the state deny that Watkins made sufficient requests for exculpatory information. Thus, because the prejudice element of the *Brady* violation is at least as demanding as the prejudice element of the "cause and prejudice" exception to procedural default, the "cause and prejudice" inquiry on Watkins' *Brady* claims collapses into the merits of those claims.

To avoid procedural default on all his other claims, Watkins relies on the narrow exception to procedural default for

a case "implicating a fundamental miscarriage of justice" because he is actually innocent of the crime. See *Schlup v. Delo*, 513 U.S. 298, 315, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). To show a fundamental miscarriage of justice based on actual innocence, and thus to obtain review on the merits of his defaulted claims of constitutional error in his trial, Watkins must come forward with new facts that raise doubt about his guilt sufficient "to undermine confidence in the result of the trial without the assurance that that trial was untainted by constitutional error." See *id.* at 317, 115 S.Ct. 851. In making that showing of actual innocence sufficient to undermine confidence in the result of the trial, Watkins is not limited to the newly-discovered material identified in his *Brady* claims; he may also rely on the DNA evidence. See *id.* at 327–28, 115 S.Ct. 851 (court must make determination concerning innocence in light of all the evidence, including evidence that became available only after trial).

Against this background, the court explains next in Part II the case the state presented against Watkins at trial, then in Part III the DNA evidence and its significance. That evidence and its effect on the state's case are central to Watkins' ability to present his constitutional claims in federal court, as well as to the prejudice element of the *Brady* violations. Finally, the court addresses in Part IV Watkins' constitutional claims of the prosecution's *Brady* violations. Because at least two of the several *Brady* violations are each sufficient, standing alone, to warrant relief, and because the cumulative effect of the systematic *Brady* violations also warrants relief, the court does not reach the other claims Watkins has raised in his amended petition.[5]

## II. *The State's Case Against Watkins at Trial*

Jerry Watkins was an early and natural suspect in the case. The morning of Saturday, November 10, 1984, Watkins' wife Janice caught him fondling her eleven-year-old sister, Peggy Sue Altes. The weekend was an emotionally charged one, to put it mildly. Other members of Janice's and Peggy Sue's family quickly learned what had happened. Janice prepared to move out of the home she shared with Watkins, but she and Watkins reconciled on Sunday. Janice testified that Watkins apologized to other members of the family Sunday night, including Peggy Sue. R. 1518–19.[6]

On Monday, November 12, 1984, however, Peggy Sue disappeared. Her body was discovered five days later, on November 17, 1984, at the edge of a field in Hancock County. She died of knife wounds to the neck that severed a jugular vein and carotid artery. Her body was nude. There was evidence of rape. An autopsy found semen in her vagina, which also had a tear caused by penetration. Her hand was clutching grass and weeds where her body was found, which indicated that she had been killed at that location. See R. 899. The medical examiner was unable to estimate the time of death other than to say that Peggy Sue had died at least 48 hours before her body was found.

The Hancock County Sheriff's Department investigated the murder for many months without results. Charges were filed against Watkins only after one Dennis Ackeret told investigators that Watkins had confessed to him just after Watkins had been sentenced in the Marion County courts for molesting Peggy Sue in September 1984, which had occurred about two

---

**5.** Based on this conclusion on the *Brady* violations, the court's final decision does not depend on whether Watkins satisfies the "actual innocence" standard of *Schlup,* although Watkins has satisfied that standard, as well.

**6.** Citations in the form "R.___" refer to the pages of the ten-volume state court record

from Watkins' trial. Citations in the form "PCR___" refer to pages in the one-volume record of the post-conviction proceeding in the state courts. Citations in the form "App.___" refer to pages in the Appendix that Watkins filed in this court in support of his amended claims.

months before she was murdered. This alleged confession was the only direct evidence of Watkins' guilt. Ackeret has a long criminal record and a long record of cooperating with the police in Indiana and Florida in return for both cash and lighter sentences for his own crimes.

Ackeret testified that he and Watkins were confined together in a holding cell in the Marion County courts when Watkins appeared in court for sentencing on the child molesting case, which was prosecuted in Marion County. Ackeret testified that Watkins was upset and crying, and told him he had just been sentenced for child molesting. Ackeret then testified that Watkins said he had killed the girl he had molested by slitting her throat and leaving her for dead in some bushes in Hancock County. R. 1058–59. Ackeret said he told his girlfriend and another jail inmate about this confession shortly after it occurred, and his girlfriend set up a three-way telephone call a few weeks later in which Ackeret told an investigator for the Hancock County Sheriff's Department about the confession.

Ackeret and police and prosecutors testified before the jury that Ackeret had been promised nothing for his testimony other than an effort to help protect him from retribution in prison. Ackeret testified that he told the police he would testify about Watkins' confession even if they could do nothing for him. R. 1065.

Watkins testified at trial. He denied making the confession to Ackeret. He testified that a man he did not know had been in the holding cell the day of his sentencing and had asked him lots of questions about his case, although Watkins said he would not have been able to identify Ackeret as the person. Watkins said he told the man in the holding cell what his case had been, and then continued: "and a little bit later I asked him if he'd heard about a little girl being murdered and being dumped out in Hancock County. I told him that that was my sister-in-law and I wished that the detectives would find the one or the ones that did it." R. 1767.

Watkins also called as a witness a person incarcerated with Ackeret who described a conversation in which Ackeret had described a scheme for getting out of jail. The plan was to find an unsolved crime, have a confederate research the newspaper coverage, and then use the information to convince the police that Ackeret had knowledge of the crime. The state responded with evidence of newspaper stories about Peggy Sue's murder that had been inaccurate in certain details, but as to which Ackeret's testimony had been accurate. The state also introduced evidence showing that Ackeret and Watkins had both appeared in court the same day, on August 14, 1985. Both sides offered evidence from other witnesses (most of whom had been inmates in the Marion County or Hancock County jails) tending to support or impeach Ackeret's testimony in various ways.

Apart from this dubious alleged jailhouse confession (about which Ackeret has since said he lied, as discussed below), there was little evidence tying Watkins to Peggy Sue's murder, even though the admitted molestation made Watkins an obvious suspect. No physical evidence linked Watkins to the crime. Watkins and his wife testified that Watkins was never in the right place at the right time to have been able to abduct Peggy Sue and murder her, but it was a difficult alibi defense because it had to cover several days. The medical evidence could not fix the date of Peggy Sue's death.

An issue arose during trial concerning the results of polygraph examinations. Watkins' lawyer cross-examined the state's chief investigator on his reasons for not pursuing another suspect, one Bill McClain. When pressed, the detective testified that McClain had passed a lie detector test. The trial court had issued an order *in limine* barring evidence of any polygraph tests. After this testimony, Watkins asked the court to lift the order so that he could present evidence that he too had passed a polygraph test on Peggy Sue's murder. The trial court declined to do so.

At trial, which occurred before DNA testing was available (at least as a practical matter), the state introduced evidence of blood types from blood tests and tests of evidence collected in the autopsy. The evidence showed that Peggy Sue Altes was blood type A and that Watkins was blood type O. The vaginal swabs of semen taken during the autopsy tested positive for blood type B, which would be consistent with blood types B or AB, but is definitely not consistent with Watkins' blood type O.

However, the state offered an explanation for these results. The state's expert witness testified that, with the blood and semen evidence, "we couldn't really eliminate a blood type of any particular type for the semen donor...." R. 997–98. She said the evidence of blood type B was "very spurious" and "erratic." R. 996. She also testified that, although the evidence of type B blood could have resulted from an assailant having B or AB blood, it could also have resulted from bacterial contamination occurring in the days before Peggy Sue's body was discovered. R. 996–97.

The defense questioned the "bacterial contamination" theory and argued that the blood test results showed Watkins could not have been the murderer. The state argued in rebuttal that the blood test results were simply inconclusive. Relying on the bacterial contamination theory, the state argued the blood tests could not eliminate any male, including Watkins, as the source of the semen. R. 2227–28, 2234. The state also pointed out in its closing argument that there was "no evidence whatsoever that anybody else ever molested Peggy Altes." R. 2177.

The jury deliberated until 2:15 a.m. their first day of deliberations and reported an impasse. R. 2302. The jury asked for and received transcripts of the trial testimony of Ackeret, his girlfriend Jeanne Rosner, and Paul Frazzitta, who had been housed with Ackeret in the Marion County Jail. R.

2295–2307. During the second day of deliberations, the jury found Watkins guilty of murder.

At the penalty phase of the trial, the principal defense was residual doubt. See R. 2346. The jury returned a recommendation against the death penalty. The judge sentenced Watkins to what was then the statutory maximum of 60 years in prison.

After Watkins was found guilty, he moved for a new trial based on affidavits from two men who had been incarcerated with Ackeret. They testified that Ackeret had told them that he had lied about Watkins and that his description of the details of Peggy Sue's murder was based on information that had been given to him by a detective. R. 18–31. The trial court denied Watkins' motion for a new trial. The Supreme Court of Indiana found that the denial was not an abuse of discretion. *Watkins v. State*, 528 N.E.2d at 460.

### III. *The New DNA Evidence*

■ In 1992 Watkins filed with the state trial court a petition for post-conviction relief seeking DNA testing. The trial court granted Watkins' request to have his blood and evidence from the case tested for DNA identification. The tests were performed by GeneScreen in 1993.

The tests performed on the samples are known as "DQ Alpha" tests. See PCR 201–03 (report of test results); PCR 235–39 (explaining the test); see also Andre Moenssens, *et al.*, Scientific Evidence in Civil and Criminal Cases 910–15 (4th ed.1995) (describing DQ Alpha testing). A DQ Alpha test looks at a part of the HLA gene on the sixth pair of human chromosomes. There are six different genotypes, known as 1.1, 1.2, 1.3, 2, 3, and 4. Each person has two DQ Alpha portions of that gene, one on each of the two chromosomes in the sixth pair, so there are 21 possible combinations of genotypes. See PCR 235–38.[7]

---

**7.** GeneScreen's Dr. Robert Giles testified in the post-conviction hearing that the semen samples from this case were too small to

perform Restriction Fragment Length Polymorphic (RFLP) testing, which can offer

## A. *The DNA Test Results*

The original written report of the Gene–Screen tests from this case is found at PCR 201–03. GeneScreen tested one vaginal swab from the victim, two blood samples known to be from Watkins, and one blood sample from the victim. Watkins' blood tested as 4/4, meaning that both of his DQ Alpha portions are the same. Peggy Sue Altes' blood tested as 1.2/3, meaning that she had those two types of DQ Alpha portions. The female material from the vaginal swab also tested as 1.2/3, which is consistent with Peggy Sue's blood.

The critical test results were those from the male material from the vaginal swab. That material tested as 1.1/4, with a "faint" result of 3. The GeneScreen testers concluded the faint 3 "was likely contributed by the victim" from the female portion of the swab materials. See PCR 203; see also PCR 270–72 (Dr. Giles explaining how such faint results are possible where testers must separate male and female portions of material from one swab).

The 1.1 results from the vaginal swab cannot possibly be attributed to Jerry Watkins or to Peggy Sue Altes. On that point, the record permits simply no basis for reasonable dispute, and the importance of this evidence cannot be overstated. The 1.1 results mean that semen from someone other than Jerry Watkins was deposited in Peggy Sue Altes' body at the time of her death.

The state nonetheless insists this evidence does not show Watkins' innocence, let alone a right to a new trial. On this point the state makes two arguments. First, the state contends the DNA evidence does not foreclose the possibility that Watkins was the source of some of the semen, so that there were two rapists at the time of Peggy Sue's murder. Second, the state points out that Watkins was convicted of murder rather than rape or child molesting, so that the DNA evidence

shows nothing material about the crime of conviction. Neither argument withstands scrutiny.

## B. *The State's New Two Rapists Theory*

The DNA evidence shows beyond dispute that at least some of the semen found in the victim at the time of her death did not come from Jerry Watkins. The evidence does not foreclose, as a matter of indisputable scientific fact, the possibility that the semen came from two men. Dr. Giles testified that, because the DQ Alpha results were 1.1/4, he could not completely exclude the possibility that Watkins was a source because his DQ Alpha genotype is 4/4, and some of the material on the vaginal swab tested as 4. This theoretical possibility to explain the DQ Alpha test results is that the male portion of the swab material could have come from a man like Watkins with 4/4 DQ Alpha, which was mixed with an equal amount of material from another man with 1.1/1.1 DQ Alpha.

In an effort to keep Jerry Watkins in prison, the state has clung to this theoretical possibility. A close look at this possibility shows it is farfetched, both as a matter of science and in terms of the overall evidence in the case. The theoretical possibility is also completely inconsistent with the theory of the case that the prosecution presented to the jury.

Dr. Giles explained that the 1.1 portion and the 4 portion of the male material on the swab were of equal intensity. That equal intensity would be expected if the sperm came from one man with the 1.1/4 genotype. Dr. Giles described that explanation as the "most reasonable" and the "more logical easiest interpretation" of the 1.1/4 results. PCR 260, 264. To get such a result from two men, one with DQ Alpha portions of 1.1/1.1 and one with 4/4 (like Watkins), Dr. Giles explained, the two men

more precise identification than the DQ Alpha tests performed in this case. See PCR 239–40, 272. Petitioner's counsel has reported that he asked GeneScreen to attempt further

testing by copying or amplifying any remaining samples. The attempt was not successful. See Amended Claims at 3 n. 5.

would have to have deposited semen mixed so that the swab collected equal amounts of sperm from each. PCR 265–66. Dr. Giles testified that this possibility of an equal mixture of 1.1/1.1 and 4/4 from two men was "farfetched" from a scientific standpoint. PCR 265.

How did the state courts deal with this evidence? Based on this evidence, the state trial court found in the post-conviction proceeding as a fact: "The DNA analysis did not exclude Jerry E. Watkins as a donor of some of the seminal fluid on the victim's vaginal slides [sic, should be swabs] *although his status as a donor was unlikely.*" PCR 127 (emphasis added). That finding of fact is clearly correct. However, the trial court stated as a conclusion of law:

> The DNA analysis evidence is cumulative of the blood testing evidence at trial. Such evidence basically repeats in an upgraded form testimony which was presented to the Jury at the original trial wherein it was indicated the seminal fluid contained in the victim was contributed by a donor with a blood type different from the Defendant's.

PCR 128. The Indiana Court of Appeals commented on that trial court conclusion as follows:

> In other words, the jury was fully aware of the proposition that there was an incompatible blood type, although Watkins could not be definitely excluded by the test results introduced at trial. Likewise, the DNA tests provide the same information: Watkins cannot be definitely excluded as a perpetrator *but the results suggest the possibility of the participation of another perpetrator.* Thus, the probative value of the results of both tests is similar.

*Watkins v. State,* slip op. at 5–6, 1996 WL 42093(emphasis added).

■ This court is considering the DNA evidence as it applies to Watkins' claims of actual innocence and cause and prejudice to excuse his failure to present his *Brady* claims and other constitutional claims to the state courts. That is, the state courts

did not adjudicate the precise claims before this court. However, the state courts did address directly the significance of the DNA evidence and Watkins' claim that the evidence shows his innocence. Under these unusual circumstances, the court assumes at least for purposes of argument that this court's adjudication of the actual innocence issue is subject to the "unreasonable determination of the facts" standard in 28 U.S.C. § 2254(d)(2). Applying this standard, the state courts' treatment of the DNA evidence as cumulative was an unreasonable determination of the facts in light of the evidence presented to the state courts.

First, the Court of Appeals' statement that the DNA results "suggest the possibility" of another perpetrator reflects a clear misunderstanding of the evidence. In terms of 28 U.S.C. § 2254(e)(1), clear and convincing evidence shows the Court of Appeals' statement is wrong. The DNA results do not merely "suggest the possibility." They prove conclusively—beyond any reasonable doubt—that someone who was not Jerry Watkins raped the victim at the time of her death. The Court of Appeals' assessment of the DNA results as merely "cumulative" to the ambiguous blood test evidence admitted at trial was based on that court's basic misunderstanding of the significance of the DNA evidence. That misunderstanding alone shows the state courts' evaluation of this evidence was unreasonable.

■ Second, based upon the misunderstanding of the evidence, the state courts failed to consider the significance of that evidence in the context of all the evidence at trial. Evidence is "cumulative" when it "goes to prove what has already been established by other evidence." *Smith v. Secretary of New Mexico Dep't of Corrections,* 50 F.3d 801, 829 (10th Cir.1995) (ordering habeas relief based on *Brady* violations). Although the DNA results do not "definitely exclude" Watkins, the state courts overlooked the dramatic difference in the *quality* of evidence at trial and in

the post-conviction proceeding on that point. Evidence that converts an arguable, hotly contested possibility into a certain fact cannot fairly and reasonably be described as "cumulative."

The state courts failed to take into account the use the state was able to make at trial of the ambiguity of the blood test results. At trial, the state managed to use the theory of "bacterial contamination" to discredit the blood test results. The state then argued to the jury that those test results were inconclusive on any issue. See R. 996–97, 1025–26 (testimony of expert witness on results of blood tests); R. 2227–28, 2234 (rebuttal closing argument). With this "explanation," the tests excluded no male as the molester/rapist and therefore posed no challenge to the confession as reported by Ackeret. At trial, the state never suggested that more than one person was responsible for raping and killing Peggy Sue. In fact, the prosecutor argued to the jury: "There is no evidence whatsoever that anybody else ever molested Peggy Altes." R. 2177.

With the DNA evidence, that last statement is now conclusively proven wrong. The jury was told only that the blood test results did not exclude Watkins or any other male as a suspect. To explain the DNA evidence showing beyond dispute the presence of semen from someone other than Watkins, the state must resort to the theory that Watkins and another person raped the victim at the time of her death. With the DNA evidence, the state courts and this court also confront undisputed expert evidence that a person, like Watkins, with a 4/4 DQ Alpha portion could have been involved only if one is willing to indulge in the "farfetched" assumption that the vaginal swab just happened to collect equal amounts of sperm from one man with 1.1/1.1 DQ Alpha and another with 4/4.

Moreover, Ackeret never claimed that Watkins told him anyone else was involved. Thus, under the state's new two rapists theory, a jury would have to believe beyond a reasonable doubt that Wat-

kins withstood repeated questioning by the police, coordinated an elaborate false alibi with his wife, but then confessed a horrific crime to a total stranger in a jail holding cell—and that he made this remarkable confession without ever mentioning that another person was involved. "Farfetched" is a generous description of this theory.

Whatever one thinks of the state's "bacterial contamination" theory at trial, the new DNA evidence definitively excludes the possibility that Watkins and only Watkins raped and killed the victim. The DNA evidence thus forces the state to argue its new theory of two rapists. In light of all the evidence, that theory is merely an improbable theoretical possibility that no reasonable juror would credit beyond a reasonable doubt. On this record, the state courts' treatment of the DNA results as merely "cumulative" cannot stand as a reasonable assessment of the facts.

### C. The State's New Effort to Separate the Murder from the Rape

The state's second argument is that Watkins has shown at most only "legal" innocence as distinct from "actual" innocence. See *Calderon v. Thompson,* 523 U.S. 538, 559, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998); *Bousley v. United States,* 523 U.S. 614, 623–24, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). Because Watkins was convicted of murder rather than rape, the state argues, even evidence that he is innocent of rape would not show he is actually innocent of murder.

The argument may be technically correct as an abstract legal proposition, but it is beside the point in evaluating the significance of the DNA evidence in light of both all the other evidence in the case linking the rape and the murder and the prosecution's use of that evidence. Under *Schlup v. Delo,* the court must consider all the available information, including the DNA evidence and the new evidence of *Brady*

violations. See 513 U.S. at 327–28, 115 S.Ct. 851.[8]

Both sides agree the physical evidence from the autopsy shows that Peggy Sue was raped very close to the time of her death. See R. 900–04 (medical examiner testified that vaginal wound occurred when victim was alive, but close to the time of her death); R. 2162 (state argued in closing that wounds from rape were as old as fatal knife wounds to throat). The state contended at trial that the same person—Watkins—committed both crimes. In closing argument, the state asserted there was no evidence that anyone else had molested Peggy Sue Altes. R. 2177. The trial record contains not a hint of a suggestion that two different people were responsible for her rape and her murder. The prosecution never even suggested that possibility as a means for explaining the results of the blood tests. The prosecution chose instead to rely solely on the "bacterial contamination" theory to explain those results.

In addition, the prosecution used the evidence linking the rape and murder to persuade the trial court to admit damning evidence against Watkins. The trial court admitted evidence that Watkins had molested Peggy Sue and that he had earlier molested her older sister. (The testimony indicated that he had fondled their breasts and genitals.) The trial court admitted this evidence on the theory that Watkins showed a "depraved sexual instinct." But that evidence was admitted as relevant *only because there was also evidence that the victim had been raped,* presumably, so the state's theory went, by Watkins. See *Watkins v. State,* 528 N.E.2d at 458 (on direct appeal, upholding admission of evidence on theory of "depraved sexual instinct" because of evidence of rape at the time of the murder). By arguing to this court that the murder and the rape were not necessarily linked, the state has abandoned the foundation of both the case it

persuaded the trial judge to allow and the case it persuaded the jury to credit beyond a reasonable doubt.

### D. Applying the "Actual Innocence" Test

Thus, when one understands the DNA evidence and the state's case against Watkins, the DNA evidence cannot reasonably be treated as merely "cumulative." It changes the picture completely. The state's theory that Watkins alone raped Peggy Sue and then killed her—the only theory argued to the jury—is excluded by the DNA evidence beyond any reasonable doubt.

The test under *Schlup v. Delo* is whether the petitioner shows that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." 513 U.S. at 327, 115 S.Ct. 851, quoting *Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). The Supreme Court explained in *Schlup* that the petitioner must show it is "more likely than not that no reasonable juror would have convicted him in the light of the new evidence." 513 U.S. at 327, 115 S.Ct. 851. The Court went on to explain that this standard is more stringent than the simple "prejudice" standard but not as stringent as the "clear and convincing evidence" standard required under *Sawyer v. Whitley,* 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992), for claims by a factually guilty defendant that aggravating circumstances needed to support imposition of the death penalty were not present. See *Schlup,* 513 U.S. at 327, 115 S.Ct. 851.

The Supreme Court offered lower courts the following guidance in *Schlup.* First, the district court is not bound by the rules of admissibility that would govern at trial, so the court may consider the probative force of evidence that was excluded or

---

8. Cf. *Calderon v. Thompson,* 523 U.S. at 560–65, 118 S.Ct. 1489 (where victim was murdered and there was strong evidence of rape, petitioner made no showing of actual innocence where (a) he made no attempt to show

factual innocence of murder and (b) his claim that victim had consented to sexual relations with him was inconsistent with physical evidence and his testimony to that effect was "fantastic" and incredible).

unavailable at trial. *Id.* at 327–38, 115 S.Ct. 851. Second, the court must make the determination of innocence in light of all the available evidence, including the newly discovered evidence. *Id.* at 328, 115 S.Ct. 851. The court does not act itself as a hypothetical juror, but must instead "make a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* at 329, 115 S.Ct. 851. In making this determination, the court must keep in mind the term "reasonable." The court must presume that a reasonable juror would consider fairly all the evidence presented and would "conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt." *Id.*

The *Schlup* Court also distinguished between its standard of actual innocence and a claim that there is insufficient evidence to support a conviction, which would be governed by *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under the *Jackson* standard, the court must credit all the evidence tending to support conviction. See *Schlup,* 513 U.S. at 330, 115 S.Ct. 851. In this case, the court assumes for purposes of argument that Ackeret's description of Watkins' jailhouse confession, despite all its credibility problems, is enough under the *Jackson* standard to support a conviction. Applying the *Schlup* standard in this case, however, the district court must make the probabilistic assessment of what reasonable, properly instructed, and conscientious jurors would do if they were presented with all the evidence, including the new DNA evidence.

Because the new DNA evidence conclusively disproves the only theory the state presented at trial, all that remains of the state's case against Watkins is the far-fetched suggestion that Watkins truthfully confessed to Ackeret, but did so without ever mentioning that someone else also raped Peggy Sue and was involved in killing her, and that, by sheer happenstance, the samples collected on the vaginal swab collected exactly equal amounts of sperm from the two men. Even without the DNA evidence, this was a close case. With the addition of the DNA evidence, and under a standard of proof beyond a reasonable doubt, this court is confident that no reasonable juror would find Watkins guilty of murdering Peggy Sue Altes.[9]

In short, in the American criminal justice system, no one should be sentenced to 60 days in prison, let alone 60 years, on the theory and evidence the state relies upon in this case to keep Jerry Watkins in prison.[10]

---

**9.** The state contends that its "theory" of the case at trial "espouses no particular view concerning whether Watkins acted alone, or in concert with someone else, simply that he was involved with her death." Resp.Mem. at 9. The formal charges against Watkins might have allowed for the possibility that Watkins acted with someone else, but in evaluating a showing of actual innocence, the court must look not only at the formal charges but at the totality of the evidence and the trial—as this court has in great detail. See, *e.g., Schlup,* 513 U.S. at 328, 331–32, 115 S.Ct. 851. The prosecutor argued specifically to the jury that there was no evidence that anyone else had molested Peggy Sue. We now know that was wrong, and the new "two rapists" theory is a highly improbable explanation for the DNA evidence.

**10.** Watkins also satisfies the more stringent "clear and convincing evidence" test under *Sawyer v. Whitley, supra,* and the test articulated in 28 U.S.C. § 2254(e)(2)(B). The results of the DNA testing are undisputed. With the state's theory of the defendant's guilt depending on a happenstance so "farfetched" as the one described by Dr. Giles to explain the DQ Alpha results of 1.1/4, no reasonable juror considering that evidence as part of all the evidence in the case would have found Watkins guilty beyond a reasonable doubt.

In fact, for these purposes it is useful to consider what would happen if the burden of proof were reversed. Suppose a hypothetical defendant in this case whose DQ Alpha results were 1.1/4 tried to raise a reasonable doubt about his guilt by suggesting that the DQ Alpha results from the vaginal swab could be explained by the "two rapists" theory, one rapist with DQ Alpha of 1.1/1.1 and the other with 4/4. The prosecution would understandably ridicule the theory as insufficient to create reasonable doubt.

## IV. *Watkins' Claims that the Prosecution Suppressed Evidence*

Watkins does not seek habeas relief on a free-standing claim of actual innocence, as was the case in *Herrera v. Collins,* 506 U.S. 390, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993). Instead, Watkins contends his trial was tainted by serious and prejudicial constitutional error, so that the courts cannot have confidence in the outcome of the trial. See *Schlup v. Delo,* 513 U.S. at 314–17, 115 S.Ct. 851 (distinguishing such a claim of innocence combined with constitutional error from the free-standing claim of innocence in *Herrera,* where no constitutional errors were identified). Watkins has raised several constitutional claims among his amended claims. The court needs to reach only his claims that he was denied a fair trial and due process of law when the prosecution suppressed exculpatory evidence.

■ Under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the government in a criminal prosecution must turn over to the defense potentially exculpatory evidence. Accord, *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (*Brady* applies to impeachment evidence); *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (*Brady* applies even in absence of request for the evidence by the accused). *Brady* is founded upon the most basic of constitutional guarantees to a person accused of a crime: a right to due process of law and a fair trial. Very simply, in our system of criminal justice, the government is not entitled to send a person to prison while it conceals from the accused any evidence that is material and tends to show he is not guilty. Although "the attorney for the sovereign must prosecute the accused with earnestness and vigor, he must always be faithful to his client's overriding interest that 'justice shall be done.' He is the 'servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer.'" *United States v. Agurs,* 427 U.S. at 110–11, 96 S.Ct. 2392, quoting *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

■ A *Brady* claim has three essential elements. First, the evidence in question must be favorable to the accused, either because it is exculpatory or because it tends to impeach the credibility of a prosecution witness. Second, the evidence must have been suppressed by the prosecution, either willfully or inadvertently. The defendant need not show that the prosecutor intentionally suppressed the information. See *Agurs,* 427 U.S. at 110, 96 S.Ct. 2392 (*Brady* violation depends on "the character of the evidence, not the character of the prosecutor"). Third, prejudice must have resulted, which means the petitioner must show "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler,* 527 U.S. at 280, 119 S.Ct. at 1948, quoting *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375. The question of prejudice is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." 527 U.S. at 288, 119 S.Ct at 1952, quoting *Kyles v. Whitley,* 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).[11]

■ Watkins has identified several categories of exculpatory evidence that the prosecution failed to disclose to his trial lawyers:

11. The reasonable probability test is not a sufficiency of the evidence test. A defendant need not show that no reasonable juror *could* convict, see *Kyles,* 514 U.S. at 434–35, 115 S.Ct. 1555, but that the undisclosed information, when considered in light of all the evidence at trial and newly available evidence, undermines confidence in the outcome of the trial. In making this determination, the court must consider the undisclosed information item by item, but must also consider the cumulative effect of all the suppressed evidence, including the effect on the defendant's trial preparation or presentation. See *id.* at 436–37, 115 S.Ct. 1555; *Bagley,* 473 U.S. at 683, 105 S.Ct. 3375.

A. Evidence from Jonathan Barger on the circumstances of Peggy Sue's abduction.

B. Evidence of other potential suspects, including the Munson brothers and the Beaver brothers.

C. Evidence that another potential suspect had taken and, unlike Watkins, failed a polygraph test about Peggy Sue's murder.

D. Evidence that law enforcement officers had shown Dennis Ackeret pictures of Peggy Sue's body and had taken him to the site where she was killed; that placing Ackeret with Watkins in a cell had been contrary to a direct, specific order of the Marion County Jail commander; and that Ackeret received undisclosed benefits for his testimony against Watkins.

Watkins easily satisfies the first element under *Brady*. The evidence from Barger, the evidence of other potential suspects, and the evidence that another suspect failed a polygraph test are all plainly exculpatory items that should have been disclosed. Correspondence and other records relating to Ackeret are impeaching and also should have been disclosed. Also, if Ackeret in fact was shown pictures of the body and was taken to the site of the murder, that would be explosive impeachment evidence.

■ Watkins also satisfies the second element of *Brady* —the state suppressed these materials.[12] Watkins discovered this evidence not in the prosecutors' files but in the files of the Hancock County Sheriff's Department in the course of counsel's investigation after appointment by the court in this case. The location of the information makes no difference. Under *Brady*, the prosecution's obligation extends to information known to investigating agencies and officers. See *Crivens v. Roth*, 172 F.3d 991, 996 (7th Cir.1999) (reversing denial of habeas relief based on *Brady* violation); *United States v. Morris*, 80 F.3d 1151, 1169 (7th Cir.1996); *Carey v. Duckworth*, 738 F.2d 875, 877–78 (7th Cir.1984) ("a prosecutor's office cannot get around *Brady* by keeping itself in ignorance, or compartmentalizing information about different aspects of a case"). "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *United States v. McVeigh*, 923 F.Supp. 1310, 1313 (D.Colo.1996), quoting *Kyles*, 514 U.S. at 437, 115 S.Ct. 1555.

The state does not contend any of this evidence was available to Watkins before his state court proceedings had come to an end. Thus, it cannot be said here that Watkins "failed to develop the factual basis" of his *Brady* claims in the state courts. Cf. *Michael Williams v. Taylor*, —— U.S. ——, ——, 120 S.Ct. 1479, 1491, 146 L.Ed.2d 435 (2000) (petitioner "failed to develop the factual basis" for *Brady* claim where record showed his attorney in state court was familiar with "suppressed" report and should have recognized potential *Brady* claim then).

Five months before trial, Watkins' lawyers served specific discovery requests on the prosecutor that should have caused him to disclose the interview notes with Barger, the interview notes regarding the Munson and Beaver brothers, the results of any polygraph tests, and correspondence and other information relating to Dennis Ackeret. See R. 47–50 (¶¶ 2, 12, 15, 20–21). In response, the prosecutor hedged, stating he was providing only "information actually supplied to the Prosecuting Attorney's Office and no representations are made as to any information

---

12. The possible exception is information that prosecutors and/or investigators fed information to Ackeret. The state certainly did not disclose such information. As discussed below in Part IV–D, however, whether the information was actually fed to Ackeret, so that there would have been such important information to disclose, is a disputed fact that the court does not resolve on the paper record. The state cannot suppress information that does not exist.

which has not been supplied to said Prosecutor's Office." R. 90. At that point, however, the prosecutor and law enforcement had been investigating the case for more than 16 months.

Watkins' lawyers continued to insist on complete, non-evasive responses from the prosecutor in second, third, and fourth motions to compel. See R. 409, 412, 418. As late as July 29, 1986, just three weeks before trial, the prosecutor continued to say his responses were "based upon information actually supplied to the Prosecuting Attorney's Office and no representations are made as to any information which has not been supplied to said Prosecutor's Office." R. 415.

In their fourth motion to compel, filed August 6, 1986, Watkins' lawyers rightly insisted that the prosecutor stop dodging and expand his responses to include information in the hands of law enforcement agencies involved in the case. R. 418. The court granted the fourth motion to compel. The court ordered the prosecutor to comply no later than August 12, 1986, and to certify that all production was then "full and complete." R. 420. On August 18, 1986, the prosecutor filed his certificate of compliance:

> Comes now the State of Indiana, by and through Larry C. Gossett, Prosecuting Attorney for the 18th Judicial Circuit, and certifies to the Court that all materials in possession of the State of Indiana have been provided or produced for inspection by the defendant and his attorney by August 12, 1986.

R. 421. The record before this court now shows the certificate of compliance was wrong. The prosecution clearly failed to produce responsive exculpatory information from the files of the Hancock County Sheriff's Department.

The state has offered neither excuse nor explanation for the prosecutor's multiple failures, which can fairly be described as systematic. The failures are numerous. They occurred in the face of repeated, specific requests. They occurred despite clear evidence that the prosecutor was well aware of his obligation to seek out exculpatory material from law enforcement agencies even if those agencies had not voluntarily given it to the prosecutor. Fortunately, in the terms of Justice Stevens' concurring opinion in *Kyles v. Whitley,* cases with so many "blatant and repeated violations of a well-settled constitutional obligation" are "extremely rare." 514 U.S. at 455, 115 S.Ct. 1555.

Thus, the principal dispute here is whether Watkins can show the critical third element of a *Brady* violation, that failure to disclose the exculpatory material prejudiced Watkins' defense at trial. See *Strickler,* 527 U.S. at 288–89, 119 S.Ct. at 1952–55 (affirming denial of relief where petitioner failed to show sufficient prejudice from prosecution's failure to disclose prior inconsistent statements from key witness). That issue requires consideration of the evidence in detail. The court must consider the items of evidence both separately and in terms of their cumulative effects. See *Kyles v. Whitley,* 514 U.S. at 436–37 & n. 10, 115 S.Ct. 1555.

### A. *Evidence from Jonathan Barger*

Watkins has submitted notes from police investigators' interviews with a Jonathan Barger on December 11, 1984, and on February 4, 1985. Barger gave police an eyewitness account of Peggy Sue's abduction that tends to show Watkins was not guilty. See App. 15–21.

The detailed interview notes show that Barger told police he had seen Peggy Sue talking with a friend in Porter Park in the afternoon shortly before 2:30. Barger tied the specific time to his delivery schedule. See App. 21. Barger did not specify the date, but he said it was a day when school was out, as it was in observance of Veterans' Day on Monday, November 12, 1984, the day Peggy Sue disappeared. See R. 729. Barger also described Peggy Sue's clothing in some detail: blue tennis shoes, white and fur coat, blue corduroy pants, half zipped, with a white blouse and hair "feathered." App. 16, 18. Peggy Sue's

mother testified at trial that she was wearing a white fur jacket, burgundy corduroy pants, and blue tennis shoes the day she disappeared. R. 750. Also, her hair could fairly be described as "feathered." See R. 727 (school picture).

Barger said he saw Peggy Sue get in the passenger side of a black Camaro; the notes say "she didn't want to get in he grabbed her by the sleeve." App. 19. Barger also gave detailed descriptions of the black Camaro. The notes indicate the car had grey stripes lengthwise up by the door handles, rust around the fender over a rear wheel, a blue interior, and a piece missing from the "scoop" or wing on the back of the car on the passenger side. Barger also described the driver as having a mustache and black curly hair that puffed out in the back.

The Barger interview notes provide powerful exculpatory information for Watkins. Watkins asserts without contradiction that there is no evidence linking him to such a black Camaro. Barger's description of the driver does not fit him at all. See R. 735 (photograph of Watkins as he appeared at the time of Peggy Sue's disappearance). In addition, Barger saw Peggy Sue being abducted before 2:30 p.m. on the day she disappeared, November 12, 1984. Undisputed evidence shows that Watkins was at work that day and clocked out at 3:31 p.m., see R. 1392, which is when his wife testified she picked him up at work. See R. 1527.

The state makes several attempts to rebut the obvious significance of the Barger information, but none are persuasive.

First, the fact that Barger did not specify the exact date he saw Peggy Sue pulled into the car offers no good reason to discount the information. As noted above, his account fits with her disappearance in several respects. The jury heard she was last seen in Porter Park between 2:00 and 3:00 p.m. on November 12, 1984. R. 745. November 12th was a day off from school for Veterans' Day. Barger's description of Peggy Sue's clothing is also quite consis-

tent with her mother's description of her clothing the day she disappeared.

Second, the fact that Barger's information is not sworn is not a reason for rejecting it in this proceeding. Whether Barger provided a sworn statement for the police file was essentially up to the investigating officers. It was certainly far outside of Watkins' control, for Barger's existence and the eyewitness account he provided were unknown to Watkins and his lawyers. See App. 110–15. If the Barger information had been disclosed to the defense, as it clearly should have been, the defense would have had a fair opportunity to talk with Barger fourteen years ago, before the trial.

Watkins' two surviving lawyers have testified in uncontested affidavits that they would have tried to use the Barger information to bolster Watkins' alibi by showing that Peggy Sue was abducted while Watkins was at work. See App. 111, 114. In light of their independent investigation and vigorous defense of Watkins, there is no reason to doubt them on this point. On this record, the court can assume that if the defense had known about Barger, he would have been called as a witness and his testimony would have been consistent with his two interviews with the police.

It is well established that exculpatory information must be disclosed under *Brady* even if the information would not be admissible at trial, at least as long as there is good reason to believe that disclosure of the exculpatory information would have led to the discovery of admissible evidence. See *Felder v. Johnson,* 180 F.3d 206, 212 n. 7 (5th Cir.1999) (general question is whether disclosure of inadmissible information "would have created a reasonable probability" that defendant would not have been sentenced to death); *Wright v. Hopper,* 169 F.3d 695, 703 & n. 1 (11th Cir. 1999); *Madsen v. Dormire,* 137 F.3d 602, 604 (8th Cir.1998) (where *Brady* material is not directly admissible, question is whether a link to admissible evidence is based on more than "mere speculation");

*Spence v. Johnson,* 80 F.3d 989, 1005 n. 14 (5th Cir.1996); *Spaziano v. Singletary,* 36 F.3d 1028, 1044 (11th Cir.1994); *Maynard v. Dixon,* 943 F.2d 407, 418 (4th Cir.1991) (inadmissible hearsay might have assisted defense discover other evidence); *Sellers v. Estelle,* 651 F.2d 1074, 1077 n. 6 (5th Cir.1981).

The Fifth Circuit has noted that the Fourth Circuit implied in a footnote in *Hoke v. Netherland,* 92 F.3d 1350, 1356 n. 3 (4th Cir.1996), that it read *Wood v. Bartholomew,* 516 U.S. 1, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995), to mean that inadmissible information is immaterial as a matter of law. See *Felder v. Johnson,* 180 F.3d at 212 n. 7. In *Wood v. Bartholomew,* discussed in more detail below in Part IV–C, the Supreme Court found no *Brady* violation where the prosecutor failed to disclose that a key prosecution witness had flunked a polygraph test. The Court did not rest its decision on the fact that polygraphs were not admissible in state court, but on a broader conclusion, in light of all the evidence, that the results simply would not have helped the defense. See 516 U.S. at 7–8, 116 S.Ct. 7.

*Wood v. Bartholomew* did not suddenly restrict *Brady* to only those exculpatory materials that would have been admissible at trial without any further effort by the defense. That reading would effectively undermine the very core of *Brady.* Prosecutors could conceal the existence of known eyewitnesses and their prior statements as long as those persons were not called to testify at trial. That is, if a defendant were required to show that *Brady* material was directly admissible, then *Brady* would not apply even if the prosecution concealed a verbatim statement or even a sworn affidavit from an eyewitness whose account tended to exonerate the defendant. Unless such a witness testifies at trial (which is unlikely if the defense does not know the witness exists), the verbatim statement or affidavit would be inadmissible hearsay.

This does not mean that admissibility is not an issue. The Seventh Circuit has

observed: "Information withheld by the prosecution is not material unless the information consists of, *or would lead directly to,* evidence admissible at trial for either substantive or impeachment purposes." *United States v. Dimas,* 3 F.3d 1015, 1018 (7th Cir.1993), quoting *United States v. Phillip,* 948 F.2d 241, 249 (6th Cir.1991) (emphasis added). The government's key witness in *Dimas* was a DEA agent. He had been accused by a federal prosecutor of falsifying a DEA report in a separate case. After that information came to the defendants' attention in *Dimas,* they moved for a new trial. The district court denied the motion, but the Seventh Circuit remanded for a further hearing on, among other issues, whether evidence of the accusation itself or "evidence relating to the accusation" would be admissible at trial. *Dimas,* 3 F.3d at 1019. That is, although material need not be directly admissible to qualify as *Brady* material, the court indicated there must be a readily discernible path between the material and its use either directly at trial or to discover and offer exculpatory evidence admissible at trial.

In one case following *Dimas,* the Seventh Circuit has used broad language that might be read to require the *Brady* material itself to be admissible, but the court did not actually reach that broad conclusion. In *United States v. Silva,* 71 F.3d 667, 670 (7th Cir.1995), the Seventh Circuit said "evidence that would not have been admissible at trial is immaterial because it could not have affected the trial's outcome." In *Silva* the court rejected a *Brady* claim based on information tending to impeach a mere government informant who did not testify. Because the informant did not testify, the impeaching material could not have been used at trial. *Id.* at 670–71. Most important, there was no apparent path by which the material might reasonably have led to admissible evidence. Thus, *Silva* did not address material like the Barger material, which, if it had been disclosed as the Constitution required, offered a direct path to a witness

who could have provided exculpatory testimony if he had simply told the jury what he told the interviewer for the police.[13]

Notwithstanding the broad phrasing of *Silva*, when the Seventh Circuit has confronted *Brady* claims like this one—based on notes of police and FBI interviews with witnesses—the court has closely examined the notes themselves to determine whether they contain impeaching or exculpatory information. See *United States v. Ashley*, 54 F.3d 311, 313 (7th Cir.1995) (affirming denial of relief after *in camera* review disclosed nothing exculpatory or impeaching). Such review assumes that the defense is entitled to at least a presumption that the interviewees would give testimony in court consistent with the interview notes.

In fact, Barger's information is the type of exculpatory information that courts have long recognized as core *Brady* material, where the danger of a denial of due process of law is great. See, *e.g.*, *Cannon v. Alabama*, 558 F.2d 1211, 1215–16 & n. 10 (5th Cir.1977) (reversing denial of relief where prosecutor failed to disclose existence of eyewitness who would positively identify killer as someone other than accused); *Jackson v. Wainwright*, 390 F.2d 288, 298–99 (5th Cir.1968) (reversing denial of relief where prosecutor told defense only that the only eyewitness could not identify the attacker, but failed to disclose

the witness's statement that the attacker had dark complexion so that the attacker could not have been the defendant); *United States ex rel. Meers v. Wilkins*, 326 F.2d 135, 138 (2d Cir.1964) (affirming habeas relief where prosecutor used two eyewitnesses to identify defendant as robber but failed to disclose that two other eyewitnesses had seen defendant in a show-up and told police he was not the robber; "it is hard for us to think of any other testimony that might have been more helpful to the defense in establishing its case").[14]

The importance of Barger's information can hardly be overstated. Nor has the state offered any excuse for failing to turn it over to Watkins' lawyers before the trial in 1986. Barger told the investigators that he knew Peggy Sue, and he saw her being abducted by someone who, because of the time, the place, and the descriptions of the person and vehicle, could not have been Watkins. The state withheld that critical information from Watkins.

By way of illustrating its importance, compare the close question the Supreme Court and lower courts found in *Strickler* as to whether the state's failure to turn over material impeaching a key eyewitness of an abduction was prejudicial. In *Strickler*, there was no serious doubt that the defendant had been deeply involved in the abduction, rape, and murder of the victim. Physical evidence—hairs, blood, shoe-

---

**13.** Similarly, in *United States v. Veras*, 51 F.3d 1365, 1375 (7th Cir.1995), the Seventh Circuit held that information of other conduct by the investigating police officer was not material under *Brady*. The information would not have been admissible under Fed.R.Evid. 608(b) because it would have been extrinsic evidence impeaching the witness on collateral matters. The court in *Veras* also did not consider an issue like this one, where the Barger information would have given the defense a direct path to admissible, exculpatory information, without resorting to the sort of speculation that helped defeat the *Brady* claim in *Wood v. Bartholomew*, 516 U.S. at 6, 116 S.Ct. 7.

**14.** See also *United States v. Agurs*, 427 U.S. 97, 112 n. 21, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), where the Supreme Court quoted ap-

provingly the following passage from Comment, *Brady v. Maryland and the Prosecutor's Duty to Disclose*, 40 U.Chi.L.Rev. 112, 125 (1972):

> If, for example, one of only two eyewitnesses to a crime had told the prosecutor that the defendant was definitely not its perpetrator and if this statement was not disclosed to the defense, no court would hesitate to reverse a conviction resting on the testimony of the other eyewitness. But if there were fifty eyewitnesses, forty-nine of whom identified the defendant, and the prosecutor neglected to reveal that the other, who was without his badly needed glasses on the misty evening of the crime, had said that the criminal looked something like the defendant but he could not be sure as he had only had a brief glimpse, the result might well be different.

prints—and eyewitness testimony tied the defendant directly to the crime. He had also been in possession of a bag containing the victim's identification cards and her jacket, and he had given his girlfriend the victim's pearl earrings and had tried to use her bank card. See 527 U.S. at 267, 293 & n. 41, 119 S.Ct. at 1942, 1954 & n. 41. However, the impeaching material was relevant to whether the defendant acted as a leader, which was important for purposes of sentencing. See *Strickler*, 527 U.S. at 288–94, 119 S.Ct. at 1952–55 (majority recognizes difficulty of issue but finds no prejudice); 527 U.S. at 300–06, 119 S.Ct. at 1958–61 (Souter, J., dissenting) (effective impeachment of eyewitness would have undermined decision to impose death penalty).

Under *Strickler*, the test for prejudice on this type of *Brady* violation is whether " 'there is a reasonable probability' that the result of the trial would have been different" if the suppressed information had been disclosed to the defense. 527 U.S. at 306, 119 S.Ct. at 1952. Watkins does not need to show it is more likely than not that he would have received a different verdict. The question is whether in the absence of this evidence, "he received a fair trial, understood as a trial resulting in a verdict worthy of confidence," and whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.*, quoting *Kyles*, 514 U.S. at 434–35, 115 S.Ct. 1555. The Supreme Court's analysis of the prejudice issue in *Strickler* shows the court must consider the totality of the evidence, for both sides.

If the issue in *Strickler* was close, the issue in this case is as clear as one can hope for. In this case, in contrast to *Strickler*, the central issue has always been whether Watkins was involved at all in the abduction, rape, and murder. The state has never presented any physical evidence linking Watkins to the crime. It relied instead on Ackeret's suspect account of the jailhouse confession—the supposed confession that omitted any mention of the

now indisputable fact that someone other than Watkins raped Peggy Sue at the time of her death, and the one about which Ackeret later swore he had lied. The rest of the state's case against Watkins amounted to efforts to bolster the alleged confession by: (a) focusing heavily on Watkins' admitted molestation of Peggy Sue and her sister; (b) poking inevitable holes in testimony by Watkins and his wife about an alibi two years ago covering several days; and (c) relying on disputed accounts of Watkins' behavior in the days while Peggy Sue was still missing—behavior that can be explained by Watkins' guilt and shame over the molestation, the trauma in the family as that crime came to light, and the strain on the family caused by Peggy Sue's disappearance, as well as by the state's theory that Watkins was disposing of incriminating evidence and showing signs of guilt over the murder.

With the state's case at trial as shaky as this one was, the information the prosecution suppressed about Barger's exculpatory account of Peggy Sue's abduction is enough by itself to undermine confidence in the verdict, and to require relief under *Strickler* and *Brady*. When the court also takes into account the DNA evidence and the other exculpatory information the prosecution suppressed, that clear conclusion becomes even stronger. See *Smith v. Secretary of New Mexico Dep't of Corrections*, 50 F.3d 801, 829–35 (10th Cir.1995) (ordering habeas relief based on *Brady* violations in murder case; prosecution failed to disclose information that had cumulative effect of casting strong suspicion on another suspect); *Bowen v. Maynard*, 799 F.2d 593, 612–13 (10th Cir.1986) (affirming habeas relief based on *Brady* violations in murder case; defendant had "creditable" alibi defense and prosecution failed to disclose information that had strong cumulative effect implicating another suspect).

B. *Evidence on the Munson and Beaver Brothers*

Watkins has presented more than 70 pages of notes from the Sheriff's Depart-

ment file concerning two pairs of brothers—Kenny and Billy Munson, and Kenny and Billy Beaver (or Beever). App. 22–97. The interview notes include interviews both from the original investigation and some conducted even after Watkins' trial (which obviously could not be deemed to have been "suppressed" by the prosecution before trial, but which help shed light on the earlier interview notes). The notes on the Munsons and Beavers reflect a confusing and sordid account of drug use, knives, violence, and adult men having sex with underage girls. The critical portions of the notes are the following:

A Crystal Chesher was interviewed on December 26, 1984, and told police she had seen a man who had been in a black van come up to Peggy Sue at the church and pick her hand up, bend her fingers back on her hand, then sit down. Chesher's description of the man did not fit Watkins, and there is no indication of a link between a black or dark-colored van and Watkins. The notes are not clear as to the date, time, or location where Chesher saw this. See App. 32.

Other notes indicate that Billy Beaver had come over to an unidentified interviewee's house right after Peggy Sue's body was found and said "they" had questioned him in jail about the murder, and that Beaver said "I might mess around with little girls but I could never kill one." App. 44. The record does not contain any notes of a police interview with Billy Beaver to which these notes might refer.

A series of notes appear to relate to an interview with Kenny Munson in the Indiana State Farm on January 27, 1987, which was a few days after Watkins was sentenced but while his case was still pending in the trial court. Munson apparently claimed he had given a knife to one "Coswell" the morning of November 12th, the day Peggy disappeared. App. 51. The Munson notes state: "Said Billy Beaver is the one that cut the girl's throat," App. 52, but it is unclear whether Munson was claiming first-hand knowledge (which seems unlikely) or was simply claiming to

report what "Coswell" had told him. The notes also state: "Said the reason Billy Beaver killed Peggy is because he was afraid she would tell the police like her mother that he was selling drugs to Paul Altes." *Id.* "Said Billy snatched her from the street (not the park) around 2–3 p.m. on Monday." App. 53. "There was a third guy from Chicago with Coswell and Beaver, this is the guy he Beaver buys his drugs from." *Id.* "Said Billy told me around 7:30 p.m. tuesday 11/12/84 that 'I cut the little bitch's throat.'" *Id.*

The Appendix also includes a transcript of an interview that Detective Munden and a Hancock County prosecutor conducted with Kenny Munson at the Indiana State Farm on February 25, 1987. App. 58–78. Munson described a party with cocaine and marijuana where Billy Beaver and Kenny Beaver were present. Munson claimed to have gotten in a van with the Beavers and others around 4 o'clock the afternoon Peggy Sue disappeared, and she was in the van and "wasn't crying." App. 59. Kenny Munson claimed that he and Billy (Munson or Beaver?) got out of the van at one point, that they were later picked up by the van, and that Peggy Sue was no longer there. App. 60–61. A few pages later, Munson said that "Billy admitted his brother's, his brother and this no-name party that owns the van, killed her." The questioner said: "See, this is not the story you told me before. The two previous stories." App. 63. Munson had previously said that Billy Beaver had killed Peggy Sue, but then changed his story and said it was Kenny Beaver. App. 64. At the time of the interview, Kenny Beaver was dead. Munson refused to provide the name of the driver of the van. App. 66.

Notes from an interview with Danny Hensley on February 26, 1987, say that he did not know Dennis Ackeret, and that he had been told by another person that Billy Beaver had seen blood on his brother Kenny the night Peggy Sue disappeared. Hensley denied having personal knowledge of any of this information. App. 79; see

also App. 80 (noting that someone said the night Peggy Sue disappeared, the person had seen Billy Beaver when he came home and he had blood all over him).

The state notes that the Munson/Beaver information is also unsworn, appears to contradict Barger's account of the abduction into the black Camaro, and is not specific about the date. The fact that it is not sworn is not significant for present purposes. Whether any sworn statements were obtained more than thirteen years ago was up to the investigators. Internal references in the various interview notes indicate that some of those interviewed were quite familiar with Peggy Sue, knew when she had disappeared, and at least claimed to be talking about the day she disappeared.

Watkins acknowledges that information concerning the Munsons and Beavers was messy and inadmissible in the form in which it was gathered. See Pet.Mem. at 8. Watkins points out, however, that his trial lawyers carried out an independent investigation of the case (as they should have), and he contends that even the messy and contradictory information concerning the Munsons and Beavers offered leads the defense could have pursued.

There is no doubt that the information tending to implicate the Munsons and/or the Beavers before Watkins' trial should have been disclosed to Watkins' lawyers. (The most detailed information, however, dates from January and February 1987, well after Watkins' trial, but while his motion for a new trial was still pending.)[15] The information, at least as presented to this court, is muddled and contradictory and appears to reflect a great deal of second- and third-hand information. Nevertheless, the information certainly would have provided Watkins' lawyers with leads that might have proven useful. Also, the power of Watkins' showing of actual innocence strongly indicates, of course, that Peggy Sue Altes' killer or killers remained at large.

It would still remain difficult to gauge reliably the prospect that any of the Munson/Beaver information might have affected the jury's verdict, if it could somehow have been presented to the jury, without going beyond the bounds of reasonable probabilities and engaging in prohibited speculation. See *Wood v. Bartholomew,* 516 U.S. 1, 6, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995) (reversing grant of habeas relief where potential benefits of undisclosed information were speculative and case against defendant was undisputed as to guilt and strong on contested issue of premeditation of killing). However, the court need not definitively determine whether the failure to turn over the Munson/Beaver information alone would meet the prejudice standard of *Strickler.* Watkins is entitled to relief based on the Barger information alone.

---

**15.** At least two district courts have held that a prosecutor's obligations under *Brady* extend through the period when a post-trial motion for a new trial is pending. See *United States v. Lord,* 710 F.Supp. 615, 619 (E.D.Va.1989) (denying post-trial motion by defendant to examine witness and grand jury statements; court relies on prosecutor to comply with duty under *Brady* that extends through sentencing), *aff'd,* 902 F.2d 1567 (4th Cir.1990); *Petition of Wright,* 282 F.Supp. 999, 1005–06 (W.D.Ark.1968) (granting habeas relief based on prosecutor's failure to disclose exculpatory evidence discovered after defendant was sentenced but while his motion for new trial was pending); see also *Monroe v. Blackburn,* 748 F.2d 958, 960 (5th Cir.1984) (where prosecutor failed to disclose exculpatory evidence after conviction, district court properly found

*Brady* violation and ordered state to grant petitioner a hearing on motion for new trial). The Supreme Court twice denied certiorari in *Monroe,* over dissenting opinions by Justice Marshall, who argued that the district court should have simply ordered a new trial to remedy the state's post-trial suppression of powerful exculpatory evidence after the state courts had already denied a new trial once. See *Monroe v. Butler,* 485 U.S. 1024, 1026–28, 108 S.Ct. 1582, 99 L.Ed.2d 897 (1988) (Marshall, J., dissenting from denial of certiorari); *Monroe v. Blackburn,* 476 U.S. 1145, 1148–49, 106 S.Ct. 2261, 90 L.Ed.2d 706 (1986) (Marshall, J., dissenting from denial of certiorari). This court need not go so far in this case because Watkins is entitled to relief based on the Barger information and the evidence that another suspect flunked a polygraph test.

In arguing against any finding of prejudice with respect to any of the suppressed exculpatory evidence, the state emphasizes the apparent contradictions between Barger's account and the Munson/Beaver information. Where the state has suppressed two apparently distinct lines of exculpatory information, it is not a satisfactory response to say there is no prejudice because each line may contradict the other on some important details. Because the state failed to make disclosures required by the United States Constitution, Watkins' lawyers never had a chance to investigate either of these lines of evidence. They were entitled to a fair opportunity to investigate both, to test their strength. However, the Munson/Beaver information presents serious and obvious credibility problems. To the extent the muddled Munson/Beaver information tends to conflict with Barger's eyewitness account of the abduction, those conflicts do not undermine the court's finding that the state's unconstitutional failure to disclose the Barger information prejudiced Watkins' defense.

## C. *Polygraph Examinations*

Watkins has also offered an affidavit from Virgil Vandagriff, who conducted several polygraph examinations during the investigation of Peggy Sue Altes' murder. App. 107–08. At the time, Vandagriff was working for the Marion County Sheriff's Department. He assisted the Hancock County Sheriff's Department on this case. Vandagriff tested both Jerry Watkins and his wife Janice. He concluded that Jerry Watkins did not have any knowledge regarding the murder or disappearance of Peggy Sue, and that Janice Watkins was not being deceptive and also had no knowledge of Peggy Sue's murder or disappearance. Vandagriff also testified that he tested at least one other person in this case, and that the test indicated the person had knowledge about the disappearance of

Peggy Sue. Vandagriff does not recall the person's name. He has no written records from the case.

At trial, Detective John Munden of the Hancock County Sheriff's Department testified that another suspect named Bill McClain had been given a polygraph test and had passed it, which led police to exclude him as a suspect. See R. 1293; *Watkins v. State,* 528 N.E.2d at 459. The state concedes that Watkins and his wife passed their polygraph tests. What is unexplained is why those results did not satisfy the investigators, while McClain's test results apparently removed him as a suspect.[16]

Watkins argues that Vandagriff's affidavit shows either: (a) that McClain actually flunked the polygraph test and that Munden testified falsely on that point at trial; or (b) that Vandagriff tested a fourth person who failed the test, the records of which have disappeared. The state responds that Vandagriff must be mistaken, but that argument is based on a misreading of Vandagriff's affidavit. See Resp. Mem. at 19 (asserting that Vandagriff said in his affidavit that he tested only three people in the case). Vandagriff said in his affidavit that he tested *at least* three people. App. 107. It could have been more.

Vandagriff's affidavit about this case is quite specific, and the court sees no persuasive reason to discount his testimony that he tested another person whom he found to have knowledge about Peggy Sue Altes' disappearance. Vandagriff said he gave this information to Detective Munden. Vandagriff added: "This is one of the few cases I have ever worked on where I believe an innocent man was convicted." App. 108.

Overall, the record tends to corroborate Vandagriff's testimony that he tested another person who had knowledge of Peggy Sue's disappearance. The undisputed

---

16. Vandagriff offers an explanation in his affidavit. He told Detective Munden that both Jerry and Janice Watkins had passed. Munden told him he thought that, because of their religious beliefs, Jerry and Janice Watkins were able to lie during the test without stress and thus without detection. App. 108.

facts here show the prosecution failed, without excuse, to disclose to the defense a wide range of exculpatory information. The state has presented no evidence conflicting with Vandagriff's affidavit. Any documentation would and should be in the prosecutor's (or at least the sheriff's) control. Moreover, even on the state's new theory to save Watkins' conviction, the state must concede, at the very least, that the DNA evidence shows that someone other than Watkins participated in the crime. Based on the record before this court, the court credits Vandagriff's affidavit and finds it is more likely than not that he tested another person in the case who had knowledge of the disappearance of Peggy Sue, that he turned that information over to the Hancock County Sheriff's Department, and that the information was not disclosed to the defense, as required under *Brady*.

As discussed above in Part IV–A, even where exculpatory information is not directly admissible, such as a polygraph result, it may still qualify as *Brady* material if it is reasonably likely that disclosure of the information to the defense would have led to a different outcome at trial. In *Wood v. Bartholomew*, 516 U.S. 1, 116 S.Ct. 7, 133 L.Ed.2d 1 (1995), the Supreme Court addressed a prosecutor's failure to disclose to the defense a polygraph result favorable to the defendant. In that case, the defendant had been found guilty of aggravated first degree murder for shooting and killing a laundromat attendant in the course of a robbery. The defendant's brother and his girlfriend both testified against him. The brother testified that the defendant told him outside the laundromat that he intended to rob it and to "leave no witnesses." *Id.* at 3, 116 S.Ct. 7. The defendant admitted the robbery and admitted firing the shot that killed the attendant, but he claimed his gun fired accidentally. The prosecution had given polygraph tests to the brother and his girlfriend but did not disclose the results to the defense. The girlfriend passed; the examiner opined that the brother was deceptive when he denied assisting in the robbery and denied being in the laundromat together with the defendant. *Id.* at 4, 116 S.Ct. 7.

The district court denied habeas relief. The Ninth Circuit reversed and ordered either a new trial on the issue of premeditation or reduction of the degree of the murder conviction. *Bartholomew v. Wood*, 34 F.3d 870 (9th Cir.1994). The Ninth Circuit acknowledged that the polygraph results would not have been admissible as evidence under state law. However, under *Brady*, the court reasoned that information is material if either that information or "evidence acquired through that information" would be admissible. *Id.* at 875, quoting *United States v. Kennedy*, 890 F.2d 1056, 1059 (9th Cir.1989). The Ninth Circuit reasoned that the polygraph results would have given defendant's lawyer a powerful reason to investigate further to attack the brother's story and a powerful tool in questioning the brother.

The Supreme Court summarily reversed. The Court found that the Ninth Circuit had resorted to impermissible "speculation" to conclude that the polygraph results were material under *Brady*. 516 U.S. at 6, 116 S.Ct. 7. Most important, the defendant's trial lawyer had testified that the information would *not* have helped him. He explained that the brother's deception on whether he had helped in the robbery would have shown only that the two brothers were working together and would have done little to undermine the prosecution's case. *Id.* at 7, 116 S.Ct. 7. In addition, the Court emphasized that the case against the defendant had been "overwhelming," including on the issue of aggravated murder:

> To acquit of aggravated murder, the jury would have had to believe that [defendant's] single action revolver discharged accidently, not once but twice, by tragic coincidence depositing a bullet to the back of the victim's head, execution style, as the victim lay face down on the floor. In the face of this physical evidence, as well as [the brother's and

girlfriend's] testimony—to say nothing of the testimony by Bell that the State likely could introduce on retrial—it should take more than supposition on the weak premises offered by [defendant] to undermine a court's confidence in the outcome.

*Id.* at 8, 116 S.Ct. 7.

Two aspects of this reasoning are instructive here. First, the Court in *Wood v. Bartholomew* did not merely conclude that the polygraph results were inadmissible under state law and therefore could not have been material under *Brady*. It focused instead on the use the defense likely could have made of the information. That approach is consistent with the cases collected above in Part IV–A holding that evidence need not be directly admissible to be material under *Brady*, although mere speculation is not sufficient to show the material could have led to exculpatory evidence. Second, in evaluating the overall issue of materiality and prejudice, the Court looked at the totality of the evidence in the case, including new evidence that had turned up after the trial. (That is shown by the Court's reference to Bell, a cellmate of the defendant's who testified at the second penalty phase trial in the case that the defendant had told him he made the victim lie on the floor, asked him his age, found out it was 17, replied "Too bad," and shot him. See 516 U.S. at 4, 116 S.Ct. 7.)

In this case, of course, the new evidence that has turned up after trial includes the DNA evidence, which weighs heavily toward actual innocence. Even in the absence of that DNA evidence, the state's case at trial was anything but "overwhelming." In addition, Watkins' lawyers properly conducted their own investigation of the case. His surviving lawyers (attorney and former Judge George J. Lewis has since died) have submitted uncontested affidavits saying they would have used the flunked polygraph test and other information to investigate other suspects. Moreover, the issue in this case is complete guilt or innocence for the murder of Peggy Sue Altes, not the degree of murder on the theory of an accidental gunshot into the back of a prone victim's head, as in *Bartholomew*. See also *Carter v. Rafferty*, 826 F.2d 1299, 1308–09 (3d Cir.1987) (affirming habeas relief for Rubin "Hurricane" Carter based on *Brady* violation where prosecution in murder case failed to disclose preliminary oral reports on polygraph test of key prosecution witness that were inconsistent with final written report and trial testimony). Based on the totality of the circumstances here, the prosecutor's suppression of the fact that another suspect failed a polygraph test is, like the suppression of the Barger account, a *Brady* violation that is also sufficient by itself to warrant habeas relief.

### D. *Information about Dennis Ackeret*

Watkins has also presented several new pieces of evidence affecting the credibility of Ackeret's pivotal account of the alleged jailhouse confession by Watkins.

First, Watkins has submitted a "Motion for Relief from Judgment" that Ackeret signed under penalty of perjury in October 1987 in his own criminal case. Ackeret asserted: "That the State of Indiana did in fact pay (with promises) for this petitioner's testimony, and did in fact show him not only the 'death-site,' but 'grizzely' [sic] pictures of the murder in order to inflame this petitioner's feelings towards the defendant (Jerry Watkins), and thus secured (for the state) a statement from this petitioner that could, and was used to obtain a conviction." App. 2–3. Ackeret described this conduct as subornation of perjury. *Id.* Ackeret went on to say that he was cheated and that "the Courts [of] the (State of Indiana) and (Jerry Watkins) were cheated as well." App. 4.

Watkins has also offered records from Ackeret's stay in the Marion County Jail in the summer of 1985. One item is a June 13, 1985, order from the commander of the Marion County Jail to all personnel regarding Ackeret: "At *no time for any reason* shall inmate Dennis Ackeret be put with any inmates outside of his cellblock." App. 10 (emphasis in original, with triple underlining).

If the Ackeret motion is to be believed, it is explosive. If Ackeret in fact received the detailed information about Peggy Sue Altes' murder from an (unidentified) prosecutor or investigator, that information utterly destroys the state's case against Watkins (even without regard for the new DNA evidence). If Ackeret's motion is to be believed, he has also described an intentional corruption of the criminal justice system that would expose Ackeret and others involved to both criminal prosecution and civil liability for violating Jerry Watkins' rights by using perjured testimony to convict him of murder.

At trial the prosecution introduced newspaper articles about the case in an effort to show that Ackeret had specific, correct knowledge that he could not have derived from newspaper articles. In closing argument, the prosecutor drove this point home: "How could Dennis Ackeret know about this crime? Did he research it in the paper as has been intimated? I don't think so." R. 2172. "If Jerry Watkins did not tell him that he did it—how could he make believe from any of those newspaper articles that Jerry Watkins or anybody else—it just couldn't happen." R. 2176.

If investigators in fact took Ackeret to the site and showed him photographs of Peggy Sue's body, that evidence answers the prosecutor's rhetorical questions on a pivotal issue. Such evidence would have impeached Ackeret and the prosecution's case on this crucial point, and there was no other substitute for such impeaching information. If Ackeret's accusation is true, that fact could not possibly be brushed aside as merely "cumulative" of other evidence impeaching Ackeret's credibility. The prosecution's failure to disclose such information would amount to suborning perjury and corrupting the judicial process.

What weight should the court give Ackeret's sworn motion? Both parties in this habeas action have been given the opportunity to call witnesses. Both declined the opportunity and said they were willing to have the court decide the issue on the papers.

Ackeret's 1987 accusation is consistent with the affidavits of Bruce Jones and Paul Rork that Watkins submitted in support of his original motion for a new trial. See R. 18–31 (original affidavits); *Watkins v. State*, 528 N.E.2d at 460 (two fellow inmates signed affidavits saying Ackeret "had told them he lied in testimony given at appellant's trial and the information he furnished had been given to him by a detective").

As Watkins contends, a considerable amount of circumstantial evidence tends to corroborate Ackeret's claim that the prosecutors and/or investigators gave him the information he used to testify against Watkins. Ackeret's jail card, which was part of the original trial record, shows that Ackeret visited with unidentified investigators and/or detectives three times, on July 28, July 29, and August 2, 1985, before he was placed in a holding cell with Watkins on August 14,1985. R. 1363. In addition, the jail card shows that Ackeret was signed out of the jail on November 12, 1985, exactly one year after Peggy Sue disappeared. For that excursion from the jail, there is no note or explanation at all. R. 1363. That is also the only excursion for which there is no note. That day would have been an excellent time for Ackeret to see the condition of vegetation at the time of Peggy Sue's murder so he could describe the site accurately, which was an issue during his trial testimony.

Watkins suggests there is ample reason to suspect he was "set up" for Ackeret to fabricate the account of the jailhouse confession. In addition to the visits Ackeret had with unidentified investigators or prosecutors in the two weeks before the confession, Watkins points to the jail commander's standing order that should have ensured Ackeret was not ever placed with any other prisoners, including Watkins, from outside his cellblock. See App. 10. Whoever put Ackeret in the same holding cell with Watkins on August 14, 1985, was violating that emphatic order.

Also tending to corroborate Ackeret's motion claiming perjury, of course, is the new DNA evidence, which provides indisputable evidence that someone other than Watkins raped Peggy Sue Altes at the time of her murder, and which leaves the state now clinging to the improbable possibility of two rapists with the right DQ Alpha genes whose sperm happened to be collected in equal amounts on the same vaginal swab.

In addition, a suspicious mind might wonder about Ackeret's efforts, immediately after his encounter with Watkins in the holding cell at court, to ensure that he told others (his girlfriend and Paul Frazzitta) about the supposed confession so they could later help rebut speculation that he had fabricated this account. At the time of Watkins' trial, Indiana allowed admission of such prior consistent statements by a witness as long as the declarant was available for cross-examination. See *Patterson v. State*, 263 Ind. 55, 324 N.E.2d 482 (1975), *overruled, Modesitt v. State*, 578 N.E.2d 649, 652 (Ind.1991); cf. Fed. R.Evid. 801(d)(1)(B) (excluding from hearsay definition a witness' prior consistent statements if they are offered to rebut charge of recent fabrication or improper influence or motive).

Also tending to weigh in favor of crediting Ackeret's 1987 sworn motion is the sheer volume of the prosecution's failures to turn over potentially exculpatory information to Watkins' lawyers. The state offers no excuses at all for these numerous and systematic failures. They are so numerous and systematic that they tend to weigh, at least in the absence of a convincing explanation, in favor of a conclusion that Ackeret's account of Watkins' confession was false and that he had help in putting together his story.

On the other hand, of course, there is ample reason to be skeptical about Ackeret's motion that effectively recants his trial testimony. Cases in which prosecution witnesses later recant for a host of possible reasons are not uncommon. Such recantations rarely lead to new trials. Ackeret's motion does not accuse any specific individuals. It does not provide details of time or place that could be tested against other evidence (although, contrary to the state's argument, the only fair reading of the accusation is that the photographs were shown and the site was visited before Watkins' trial). Ackeret's motion reflects his selfish motives to lie against the police and prosecution. Also, of course, Watkins' whole case is based on the foundation that Ackeret is an accomplished, experienced, and utterly untrustworthy liar willing to say anything about anybody from a witness stand. Finally, the suspicious circumstantial evidence that seems consistent with Ackeret's accusation has not yet been tested by confronting those persons who might have been involved, by learning whether there is an explanation for the circumstantial evidence, and then by testing any such explanations.

In the absence of further corroborating evidence, this court is unwilling to rely on Ackeret's 1987 motion to find that prosecutors and/or investigators in fact took him to the murder site and showed him photographs from the case as part of an effort to plant or bolster false testimony about the alleged jailhouse confession. Without finding by a preponderance of the evidence that that happened, the Ackeret motion does not show a *Brady* violation by failing to disclose such an effort to suborn perjury. A finding of such subornation of perjury would require more extensive proceedings and evidence than have been submitted here. Because Watkins is entitled to relief based on the suppression of the critical Barger eyewitness account of Peggy Sue Altes' abduction, as well as the failed polygraph, the court need not try to resolve conclusively these issues concerning Ackeret's 1987 accusation. Such an effort would delay resolution of this case and prolong Watkins' unconstitutional imprisonment.[17]

17. Nevertheless, the court must note at least the structural similarity between, on one hand

Watkins also contends the prosecutor failed to disclose to the defense additional evidence of a deal to benefit Ackeret in exchange for his testimony against Watkins. The prosecutor, who denied there was any such deal, told the jury in closing argument "we've promised him nothing," R. 2170–71, and "The testimony shows that he is not getting a deal." R. 2220. The state repeatedly argued that Ackeret came forward simply because the crime was so horrible. The final question and answer on Ackeret's direct testimony were:

Q ... why would you do something like this?

A I think that you can think, you know, consider the crime and pretty well answer that question.

R. 1065–66. The state repeatedly stressed this point in closing, arguing that Ackeret had told investigators he was willing to testify even if he got no benefit from doing so because he was so shocked by the crime. See R. 2220–21, referring to R. 1065–66.

Ackeret testified the only thing he was offered in exchange for his testimony was protection inside the Department of Correction. R. 1043, 1072. Detective Christ testified that Ackeret never asked for any consideration and was promised nothing. R. 1372–76. A Marion County deputy prosecutor testified, however, that Detective Christ had come to him with Ackeret's story and had told the prosecutor that Ackeret wanted consideration down to six years on his sentence. R. 1950, 1953. Also, the prosecutor had disclosed to Watkins' lawyers before trial an interview with Ackeret in which it appeared he was cooperating in return for a six year sentence. See R. 168 (transcript of interview on Sept. 3, 1985).

In support of his *Brady* claim for failure to disclose information about a deal between Ackeret and the state, Watkins relies on Ackeret's 1987 motion, App. 1–4, in

which Ackeret claimed the state promised to recommend a sentence of no more than ten years along with credit for various stays in jail (although he also claimed the state agreed only to recommend no *less* than ten years). Watkins has also submitted a letter dated April 11, 1986, four months before Watkins' trial, from a prosecutor in Nashville, Tennessee, to the Hancock County prosecutor (with a "cc" to the "Fugitive Section") removing a "hold" against Ackeret. App. 11. On April 24, 1986, the Hancock County prosecutor's office forwarded to the Indiana Department of Correction a copy of the Tennessee letter releasing the hold on Ackeret. App. 12.

The Tennessee correspondence should have been disclosed to Watkins' defense lawyers as potential impeachment material. Without more evidence, however, the court can only speculate about whether Hancock County authorities asked Tennessee authorities to release a hold on Ackeret as part of a deal with Ackeret, or whether Tennessee authorities simply decided not to pursue further a case against someone in such deep trouble in Indiana.

As for Ackeret's claim in his 1987 motion of a deal to recommend no more than a ten year sentence, the court has addressed above the credibility problems with the motion in general. On this specific point, Watkins' lawyers made a thorough effort at trial to show that Ackeret in fact received a great benefit in exchange for his testimony. See R. 1086–93, 1950–55, 1959 (testimony relating to avoiding 30–year addition to sentence as habitual offender). Also, even if one were inclined to credit Ackeret's claim that such a deal existed, one would have to wonder why prosecutors would have reneged on such a corrupt deal after Ackeret actually delivered a conviction of Watkins.

the state's case against Watkins at trial—a sworn accusation by Dennis Ackeret, corroborated by suspicious circumstantial evidence—and on the other hand Watkins' evidence of

suborned perjury—another sworn accusation by Dennis Ackeret, corroborated by suspicious circumstantial evidence.

Watkins has also submitted a letter dated October 27, 1986, a month after Watkins' trial, from the Hancock County prosecutor to the Indiana Department of Correction asking to have Ackeret transferred to federal custody for his protection. App. 14. This letter is consistent with Ackeret's trial testimony that the prosecutor promised only to try to see that he was protected while he was in custody. This letter does not meet the prejudice element of a *Brady* violation.

\*       \*       \*       \*       \*       \*

To summarize the court's findings on Watkins' claims of *Brady* violations: First, with the exception of the 1987 Ackeret motion, all the *Brady* claims involve exculpatory or impeaching information that plainly should have been turned over to the defense, especially in response to the defense's pointed requests. The state has offered no excuse for these violations, which are so numerous and complete as to have been systematic. The Barger eyewitness account of Peggy Sue Altes' abduction at a time for which Watkins has a solid alibi and with a description that does not fit Watkins is sufficient, standing alone, to satisfy both the prejudice standard of *Strickler* and the more demanding standard of *Sawyer*. The state's suppression of that statement alone requires relief for Watkins. Vandagriff's testimony that another suspect in the Altes murder failed a polygraph test also satisfies at least the *Strickler* standard of prejudice and is also sufficient standing alone to require relief. (The court expresses no view on whether the Vandagriff testimony meets the *Sawyer* standard.) The Munson/Beaver information (or at least the portion developed before Watkins' trial) is exculpatory, but the court need not and does not determine whether it meets the *Strickler* standard of prejudice.

With respect to the sworn Ackeret motion accusing the prosecution of suborning and himself of committing perjury, there is an unresolved question of fact as to whether the accusation is true. If it is, of course, that would show that the prosecution not only failed to disclose exculpatory information but offered inculpatory evidence that at least some member(s) of the prosecution team (including investigators) knew to be false. It is difficult to imagine a stronger claim for relief. However, because Watkins is entitled to relief based on the Barger and Vandagriff information, and because the parties have not sought to offer further evidence on Ackeret's accusation of suborned perjury, this court will not delay a decision in order to explore those accusations more thoroughly. Nevertheless, they certainly deserve further attention in other proper forums, or perhaps in this court if this decision turns out not to be the final word on Watkins' petition.

Watkins' amended claims include other related claims for relief. Because Watkins is entitled to relief, the court need not and does not address all of those claims. For the reasons set forth above, the court will issue today a writ of habeas corpus directing Watkins' custodian to release him from custody within thirty (30) days. The writ will not prohibit the State of Indiana from taking steps to retry Watkins. Although the difficulties of doing so now—after the passage of time, after Ackeret has recanted his testimony, and after the DNA evidence has become available—are obvious, that is a decision for state authorities. See *Carter v. Rafferty*, 621 F.Supp. 533, 559 (D.N.J.1985) (granting habeas relief, recognizing "practical impossibility" of a new trial, but leaving the decision on a new trial to state authorities), *aff'd*, 826 F.2d 1299 (3d Cir.1987).

### *Conclusion*

"A defendant whose position depends on anything other than a straightforward application of established rules cannot obtain a writ of habeas corpus." *Liegakos v. Cooke*, 106 F.3d 1381, 1388 (7th Cir.1997). As explained above in detail, petitioner Jerry Watkins has met this burden and has satisfied the procedural requirements for federal habeas relief. He is now entitled to relief that is long overdue. He has shown that the prosecution denied him a

fair trial by concealing from him information that tends to show he is not guilty of murdering Peggy Sue Altes. He has also come forward with new evidence which, when considered together with all the evidence in the case, shows that no reasonable jury would find him guilty of murder beyond a reasonable doubt.

Watkins did commit the despicable crime of molesting Peggy Sue Altes. He pled guilty to that crime, and the State of Indiana punished him for it. Her murder was a separate crime. Watkins is not guilty of one simply because he is guilty of the other. The prosecutor told the jury in closing argument: "The spirit of Peggy Altes is here in Court with us today and her spirit cries for justice." R. 2236. This court could not agree more sincerely. However, because the prosecutor failed to comply with his constitutional obligation to see that Jerry Watkins had a fair trial, Watkins' conviction and imprisonment have not answered that cry for justice. A writ of habeas corpus shall now issue.